United States District Court
Southern District of Texas
**ENTERED**
March 21, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| VERNON GALLIER, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-888 |
| | § | |
| WOODBURY FINANCIAL | § | |
| SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This lawsuit arises from the four plaintiffs' investments in variable annuities purchased from 2003 to 2007. The plaintiffs alleged in their state-court petition that they made the investments at the direction of David Mierendorf, a financial advisor and retirement-planning investment professional registered with Woodbury Financial Services, Inc. One of the plaintiffs was retired; the others were nearing retirement. They alleged that based on Mierendorf's promises that they were obtaining a secure investment with a guaranteed lifetime income stream, they cashed out their employer-sponsored retirement plans and put the proceeds in variable annuities that turned out to be high-risk and lost most of their value. After initiating arbitration before the Financial Industry Regulatory Authority ("FINRA"), and having that prove unsuccessful, the plaintiffs sued Mierendorf, Woodbury, and Ted Ginsberg—Woodbury's Houston-office manager and Mierendorf's supervisor—in Texas state court, alleging breach of contract, unjust enrichment, negligence, breach of fiduciary duty, violations of the Texas Securities Act, violations of the Texas Insurance Code, and breach of warranty.

1

Woodbury removed on the basis of diversity jurisdiction, alleging that Ginsberg, the only nondiverse and in-state defendant, was improperly joined.  (Docket Entry No. 1).  The court found that the plaintiffs' original state-court petition did not allege any reasonable basis for recovery against Ginsberg, denied the plaintiffs' remand motion, and dismissed the claims against Ginsberg.  (Docket Entry No. 26).

Woodbury moved to dismiss the plaintiffs' claims against it.  (Docket Entry No. 19).  The court granted the motion in part.  (Docket Entry No. 32).  The court dismissed with prejudice the plaintiffs' claims for violation of FINRA rules, violation of the Texas Securities Act, and breach of fiduciary duty.  The court dismissed the plaintiffs' unjust-enrichment claims, without prejudice, and granted leave to file an amended complaint by June 25, 2015.  No amended complaint was filed.  The plaintiffs' claims against Mierendorf, for which the plaintiffs sought to hold Woodbury liable on a *respondeat superior* and agency basis, were not dismissed.  At a status conference on July 21, 2015, however, the plaintiffs informed the court that they did not intend to pursue their claims against Mierendorf, and those claims were dismissed without prejudice.  (Docket Entry No. 38).

The remaining claims against Woodbury are for breach of oral contract, violations of the Texas Insurance Code, negligence, negligent misrepresentation, and fraud.  Woodbury has moved for summary judgment on three grounds: (1) limitations bars all of the plaintiffs' claims; (2) there are no factual disputes material to determining the breach-of-oral-contract claims; and (3) the economic-loss rule bars the plaintiffs' tort claims.  (Docket Entry No. 41).  The plaintiffs responded, Woodbury replied, and the plaintiffs surreplied.  (Docket Entry Nos. 46, 50, 51).

Based on a review of the motions, the briefs and submissions, the pleadings, the record, and the applicable law, the court grants in part and denies in part Woodbury's motion for summary

judgment.  Docket call is set for **April 4, 2016 at 4:00 p.m.** in Courtroom 11-B.

The reasons are explained below.

## I.      Background

Plaintiffs Deborah Harrison, Kathy Temple, and Caron Gallier were friends who were about to retire from careers in sales for the "Yellow Pages" at AT&T.  (Docket Entry No. 17 at ¶ 18). Plaintiff Vernon Gallier was a retired police officer.  (*Id.*).  Between 2003 and 2007, all four plaintiffs were looking for ways to maximize the benefits they would obtain from their employer-sponsored retirement plan savings.  The plaintiffs were referred to Mierendorf, an investment adviser and retirement-financial planner at Woodbury.  (*Id.*).  Mierendorf allegedly persuaded them to cash out their employer-sponsored pension plans, which guaranteed them monthly payments after retirement, and invest the proceeds in variable annuities he recommended.[1]

### A.      Deborah Harrison

Ms. Harrison was the first plaintiff to invest with Mierendorf.  A coworker, Harvey Walls, recommended that she meet with him.  That occurred several months before she retired in 2003. (Docket Entry No. 41, Ex. 9 at p. 6–7).  In the meeting, Mierendorf advised Ms. Harrison to invest in a Hartford annuity.  He promised that the annuity would provide consistent monthly income for life, that Ms. Harrison would not lose money on the principal investment, and that the principal investment would perpetually grow.  (*Id.* at 10–11).  Mierendorf also gave Ms. Harrison a table projecting the annuity's future growth.  (*Id.* at 12–13; Docket Entry No. 41, Ex. 10).  Ms. Harrison's expectation was that she could make annual 7 percent withdrawals and that the annuity would earn

---

[1]  The summary judgment evidence includes, among other things: the four plaintiffs' deposition testimony; copies of the Hartford annuity contract; quarterly statements the plaintiffs received from Hartford about the value of their annuities; and letters and documents the plaintiffs exchanged with Woodbury, Hartford, and Mierendorf.

9 percent annual growth.  (Docket Entry No. 41, Ex. 9 at p. 19–20).

On December 11, 2003, Ms. Harrison invested $527,140.23 in the Hartford annuity.  (Docket Entry No. 41, Ex. 5).  The contract stated that "all payments and values provided by this contract, when based on investment experience of a sub-account, are variable and not guaranteed as to fixed dollar amount."  (Docket Entry No. 41, Ex. 6).  The annuity included a "guaranteed income benefit rider," which was purchased at an extra charge.  (Docket Entry No. 41, Ex. 7).  The rider "provide[d] a guaranteed income benefit [giving] the right to make periodic surrenders that total an amount equal to [the] premium payments."  (*Id.*).  The rider was part of the annuity contract.  Ms. Harrison did not read the contract.  Instead, she relied on Mierendorf to provide her information about the annuity and to answer any questions.  (Docket Entry No. 41, Ex. 9 at p. 38).  Hartford sent Ms. Harrison quarterly reports about her investment.  She would "glance" at the section of the report stating the balance on her account.  (Docket Entry No. 41, Ex. 9 at p. 18–19).

Ms. Harrison closed her Woodbury account in January 2008.  (Docket Entry No. 41, Ex. 11).  She still owned the annuity.  Later that year, she began noticing a drop in its value that was inconsistent with Mierendorf's promises.  She called Mierendorf, who told her not to worry about it and that "the best thing to do was to leave everything where it was."  (Docket Entry No. 41, Ex. 9 at p. 23–24).  Although she could not recall specific statements Mierendorf made that turned out to be false, Ms. Harrison testified that Mierendorf told her that "it would be okay," "not to panic," "these things happen in the market," and the annuity's value "would come back."  (*Id.* at 24–25, 58–59).

Ms. Harrison trusted Mierendorf "completely."  (*Id.* at 58).  But in September 2009, she faxed a letter directly to Hartford requesting confirmation of the "monthly income [from the annuity]

4

and for how long." (Docket Entry No. 41, Ex. 14).  It is unclear whether she received a response.

In December 2009, Mierendorf left Woodbury and became a broker at Lincoln Financial. (Docket Entry No. 41, Ex. 9 at p. 29–30).  Ms. Harrison testified that she did not realize that Mierendorf's promises about her annuity were false or misleading until 2012. (*Id.* at 26).  In August 2012, Ms. Harrison met with Carri Tacker, a Hartford employee who was assigned to manage her account after Mierendorf left the business.  (Docket Entry No. 46, Ex. 12, 13; Docket Entry No. 51, Ex. 2).[2]  Carri Tacker told Ms. Harrison that if she continued to withdraw 7 percent annually, her income would last for another 6.5 years.  Carri Tacker advised Ms. Harrison to reduce her withdrawals and expressed concern that "if that doesn't happen then this annuity will not sustain you through retirement as you would like." (Docket Entry No. 46, Ex. 13).

Although Ms. Harrison initially invested $527,140.23, the most recent account statement in the record shows a value of $208,502.30.  (Docket Entry No. 41, Ex. 15).

### B.    Kathy Temple

Ms. Temple also received advice from her coworker, Harvey Walls, to meet with Mierendorf before she retired in 2005. (Docket Entry No. 41, Ex. 16 at p. 4–6).  In the meeting, Mierendorf advised Ms. Temple to invest in a Hartford annuity.  He promised that the annuity would provide consistent monthly income for life, that Ms. Temple would not lose money on the principal investment, and that the principal investment would perpetually grow.  (*Id.* at 8–11).  Mierendorf

---

[2]  Woodbury objects that the emails between Ms. Tacker and Ms. Harrison are not competent summary judgment evidence because they were not authenticated and are hearsay.  (Docket Entry No. 50 at p. 3).  Ms. Harrison attached her affidavit to the surreply brief, stating that the emails are a true and correct copy of her exchange with Ms. Tacker.  (Docket Entry No. 51, Ex. 2).  The emails are not hearsay because they are not admitted for their truth, but rather to show when Ms. Harrison was put on notice of Mierendorf's fraud.  *See, e.g.*, *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 776 n.39 (5th Cir. 2009).  The objection is overruled.

also gave Ms. Temple a table projecting the annuity's future growth.  (*Id.* at 13–14; Docket Entry No. 41, Ex. 17).  Ms. Temple expected that she could make annual 7 percent withdrawals and that the annuity would earn 9 percent annual growth.  (Docket Entry No. 41, Ex. 16 at p. 15–16).

On July 19, 2005, Ms. Temple invested $269,038.34 in each of two Hartford annuities.  (Docket Entry No. 41, Exs. 20, 21).  The contracts stated that "all payments and values provided by this contract, when based on investment experience of a sub-account, are variable and not guaranteed."  (Docket Entry No. 41, Ex. 6).  The annuity included a "guaranteed income benefit rider," which was purchased at an extra charge.  (Docket Entry No. 41, Ex. 7).  The rider "provide[d] a guaranteed income benefit [giving] the right to make periodic surrenders that total an amount equal to [the] premium payments."  (*Id.*).  The rider was part of the annuity contract.  Like Ms. Harrison, Ms. Temple did not read the contracts, but instead relied on Mierendorf to give her information and answer any questions she had.  (Docket Entry No. 41, Ex. 16 at p. 24–25).  Hartford sent Ms. Temple quarterly reports about her investments, which she "glanced" at and kept in her files.  (Docket Entry No. 41, Ex. 16 at p. 18–19).

Ms. Temple closed her Woodbury account in April 2007.  (Docket Entry No. 41, Ex. 18).  She still owned the annuities.  In 2008, she began noticing a drop in their value that was inconsistent with Mierendorf's promises.  She called Mierendorf, who told her that her investments were safe and that she should do "nothing.  Leave it alone.  It will come back.  It always does.  Just don't do anything."  (Docket Entry No. 41, Ex. 16 at p. 32–33).  She did nothing.

Ms. Temple called Mierendorf again in 2009.  He again assured her that "everything [was] safe," and she "trusted him" that "everything was okay."  (*Id.* at 35).  Although she could not recall specific statements Mierendorf made that turned out to be false, Ms. Temple testified that

6

Mierendorf told her that her investment was safe and would provide the promised return.  (*Id.* at 54–55).

Ms. Temple testified that she did not begin to realize that Mierendorf's promises about her annuities were false or misleading until August 2012, when she telephoned him and discovered that it was no longer a working number.  (Docket Entry No. 41, Ex. 16 at p. 46–47).  She called Hartford and learned that Carri Tacker had been assigned to her account.  (*Id.*).  Ms. Temple and Caron Gallier met with Tacker, who reviewed their account statements and told them that Mierendorf had behaved erratically and recklessly in recommending his clients' investments.  Ms. Tacker stated that she had stopped working with Mierendorf as a result.  (Docket Entry No. 46, Ex. 5 at p. 27–29).  Carri Tacker specifically criticized Mierendorf's failure to diversify his clients' investments and to adjust those investments as market conditions changed.  (*Id.*).  Carri Tacker told Ms. Temple that she could not guarantee that the annuities would provide the annual income Mierendorf had promised.  (*Id.* at 31).

Although Ms. Temple initially invested a combined $538,076.68 in two Hartford annuities, the most recent account statements in the record reflect a combined value of $359,247.54.  (Docket Entry No. 41, Exs. 26, 27).

### C.    Caron and Vernon Gallier

Vernon Gallier retired as a police officer in 2004 and met with Mierendorf at his wife's urging to discuss his retirement savings.  (Docket Entry No. 41, Ex. 28 at p. 4–5).  In the meeting, Mierendorf advised Mr. Gallier to invest in a Hartford annuity.  He promised that the annuity would provide consistent monthly income for life, that Mr. Gallier would not lose money on the principal investment, and that the investment was risk-free.  (*Id.* at 8–11).  Mr. Gallier expected that he could

make annual 4 percent withdrawals and that the annuity would earn 7 percent annual growth.  (*Id.* at 9).

On June 3, 2004, he invested $480,568.92 in a Hartford annuity.  (Docket Entry No. 41, Ex. 32).  The contract stated that "all payments and values provided by this contract, when based on investment experience of a sub-account, are variable and not guaranteed."  (Docket Entry No. 41, Ex. 6).  The annuity included a "guaranteed income benefit rider," which was purchased at an extra charge.  (Docket Entry No. 41, Ex. 7).  The rider "provide[d] a guaranteed income benefit [giving] the right to make periodic surrenders that total an amount equal to [the] premium payments."  (*Id.*).  The rider was part of the annuity contract.  Mr. Gallier did not read the contract, and, like the other plaintiffs, relied on Mierendorf.  (Docket Entry No. 41, Ex. 28 at p. 20).  Hartford sent Mr. Gallier quarterly reports about his investment, but he relied on his wife to read them.  (*Id.* at p. 12).

Ms. Gallier met with Mierendorf in 2007 after her retirement from AT&T.  (Docket Entry No. 41, Ex. 29 at p. 6).  In the meeting, Mierendorf advised Ms. Gallier to invest in a Hartford annuity.  He promised that the annuity would provide consistent monthly income for life, that Ms. Gallier would not lose money on the principal investment, and that the investment was risk-free. (*Id.* at 7–9, 24).  Ms. Gallier expected that she could make annual 7 percent withdrawals and that the annuity would continue to grow.  (*Id*. at 7–8).

On March 14, 2007, Ms. Gallier invested $411,409 in each of two Hartford annuities. (Docket Entry No. 41, Exs. 30, 31).  The contracts stated that "all payments and values provided by this contract, when based on investment experience of a sub-account, are variable and not guaranteed."  (Docket Entry No. 41, Ex. 6).  The annuity included a "guaranteed income benefit rider," which was purchased at an extra charge.  (Docket Entry No. 41, Ex. 7).  The rider "provide[d]

a guaranteed income benefit [giving] the right to make periodic surrenders that total an amount equal to [the] premium payments." (*Id.*). The rider was part of the annuity contract. Hartford sent Ms. Gallier quarterly reports on her investments, which she "sometimes" opened. (Docket Entry No. 41, Ex. 29 at p. 27, 31).

In 2008, the Galliers began noticing a drop in the value of their annuities that was inconsistent with Mierendorf's promises. Ms. Gallier frequently called Mierendorf, but he told her "not to worry about it," that she and her husband had insurance, and that she could continue to make 7 percent withdrawals. (*Id.* at 18–21, 30–31). The Galliers scheduled an in-person meeting with Mierendorf in 2009. Mr. Gallier testified that at the meeting, Mierendorf reassured them that "[e]verything's looking good. You're doing great, no problems." (Docket Entry No. 41, Ex. 28 at p. 13). When Mr. Gallier saw his account losing money, Mierendorf reassured him that "we had a big hickey . . . in 2008," but that "the stock market fluctuates . . . [and] if you wait six months, it will be right back up there where it [was]," "everything's fine," and "life is good." (*Id.* at 14). Mr. Gallier testified that he "trusted" Mierendorf. (*Id.*).

In December 2009, when Mierendorf left Woodbury and moved to Lincoln Financial, the Galliers closed their Woodbury accounts. (Docket Entry No. 1, Ex. 3 ¶ 50). The Galliers testified that they did not begin to realize that Mierendorf's promises about their annuities were false or misleading until August 2012, when Ms. Temple called Ms. Gallier and told her that Mierendorf's phone was disconnected. They scheduled a meeting with Carri Tacker, who had taken over their accounts. Ms. Gallier testified that Carri Tacker was Mierendorf's step-daughter. Ms. Tacker told them that her step-father had been acting "erratically," and that his mental-health issues required his admission to "a home or some type of a facility." (Docket Entry No. 41, Ex. 29 at p. 12–16). Ms.

Gallier could not remember whether she and Ms. Temple discussed their annuities at the meeting with Ms. Tacker.  But Ms. Temple testified that Ms. Tacker told them that Mierendorf had acted recklessly in advising his clients about their investments and that there was no guarantee that the annuities would perform as he had promised.  (Docket Entry No. 46, Ex. 5 at p. 27–31).  Although Mr. Gallier did not attend the meeting, his wife told him what she had learned.  (Docket Entry No. 41, Ex. 28 at p. 25–26).

Mr. Gallier initially invested $480,568.92 in a Hartford annuity, but the most recent account statement shows a value of $364,094.94.  (Docket Entry No. 41, Ex. 28 at p. 23–24).[3]  Ms. Gallier initially invested $822,818 in two Hartford annuities; the most recent account statements show a combined value of $393,296.51.  (Docket Entry No. 41, Exs. 34, 35).

The summary judgment evidence for each plaintiff and issue is analyzed below.

## II.    Analysis

### A.    The Summary Judgment Standard

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

---

[3] Woodbury refers to Docket Entry No. 41, Ex. 33 as containing a 2014 quarterly statement reflecting the value of Mr. Gallier's annuity.  (Docket Entry No. 41 at p. 23).  Docket Entry No. 33 only contains a quarterly statement from 2008.  The deposition testimony establishes this number.

portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id*. (quotation marks omitted); *see also Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *EEOC*, 773 F.3d at 694).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only

a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding

a summary-judgment motion, the court draws all reasonable inferences in the light most favorable

to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*,

783 F.3d at 536.

      **B.**      **Limitations**

      Texas law governs limitations on the plaintiffs' claims.  *See* Tex. Civ. Prac. & Rem. Code

§ 16.051 (breach of oral contract—four years); *id.* § 16.004(a)(4) (fraud—four years); *id.* §

16.003(a) (negligence and negligent misrepresentation—two years); Tex. Ins. Code § 541.162

(Texas Insurance Code—two years).  The parties agree that the claims with a two-year statute of

limitations are time-barred if they accrued before June 8, 2011.  The claims with a four-year statute

of limitations are time-barred if they accrued before June 8, 2009.

      The Texas legislature codified a statutory accrual standard for claims under the Texas

Insurance Code.  A common-law rule also governs the accrual of fraud claims.  On the remaining

claims, the plaintiffs invoke two common-law exceptions to the ordinary rule that a claim accrues

when a wrongful act causes a legal injury: fraudulent concealment and the discovery rule.

      **1.**      **The Accrual Date for the Claims Under the Texas Insurance Code**

      The Texas Insurance Code provides a cause of action for false, misleading, or deceptive acts

or practices.  *See* Tex. Ins. Code § 541.151; Tex. Bus. & Comm. Code § 17.46(b).  A plaintiff must

sue within two years of the following:

> (1) the date the unfair method of competition or unfair or deceptive act or practice occurred; or

> (2) the date the person discovered or, by the exercise of reasonable diligence, should have discovered that the unfair method of competition or unfair or deceptive act or practice occurred.

Tex. Ins. Code § 541.162(a).  The allegedly deceptive act or practice occurred when Mierendorf induced the plaintiffs' purchase of the annuities, which was more than two years before they sued.  Under § 541.162(a)(1), the claims are time-barred.  The question is whether the claims are also barred under § 541.162(a)(2).  The answer turns on when the plaintiffs discovered or, "by the exercise of reasonable diligence, should have discovered" the allegedly deceptive act.

Woodbury argues that if the plaintiffs had been reasonably diligent, they would have learned of facts placing them on notice of their claims by 2008.  Woodbury cites the plaintiffs' deposition testimony that they noticed the annuities losing money in 2008.  Mierendorf promised that the annuities would not lose value, would experience perpetual growth, and would be risk-free.  When the plaintiffs began to receive account statements showing a decline in the annuities' value, Woodbury argues, they knew or should have known that the annuities' actual performance cast doubt on the truthfulness of Mierendorf's promises.  (Docket Entry No. 41 at p. 31).  Woodbury cites the plaintiffs' testimony that they read neither the annuity contract, which warned of potential risks associated with the investments, nor the quarterly account statements Hartford sent them, which reflected substantial losses.  Mierendorf also gave Ms. Harrison and Ms. Temple charts projecting the annuities' future growth.  Woodbury contends that Ms. Harrison and Ms. Temple could have compared the actual performance of their annuities with the performance projected in the charts, which would have shown that Mierendorf's promises were false.

The plaintiffs counter that they were not experienced investors and that they relied on Mierendorf to give them information and answer their questions about the annuities.  The plaintiffs all testified that when they called or met with Mierendorf in 2008 and 2009, he assuaged their fears, told them not to worry, and promised them that the value of their annuities would rebound.  His

13

assurances caused them to disregard the objective signs that their annuities were losing value and not performing as he had promised.  The plaintiffs argue that they did not know and could not have known of Mierendorf's fraud until 2012, when Carri Tacker, a different financial advisor, reviewed their account balances and told them the truth about the annuities' present and future value.

In response, Woodbury points to evidence that Ms. Harrison contacted Hartford directly in September 2009 to inquire about her account status.  Woodbury argues that this evidence shows Ms. Harrison's early concern about the financial health of her annuity.  Woodbury reasons that when the plaintiffs saw the annuities lose money, contrary to Mierendorf's assurances, each of them could have contacted Hartford or Mierendorf's supervisor directly and asked about Mierendorf's insistence that their annuities were financially secure.

The testimony describing these competing and conflicting narratives, and the inferences they support, gives rise to factual disputes material to determining when the plaintiffs' causes of action accrued under the Texas Insurance Code.  As the Fifth Circuit has recognized, determining when a plaintiff was on inquiry notice of fraud is a "fact-intensive inquiry . . . typically appropriate for consideration by a jury." *See Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006) (interpreting almost identical language in the statute of limitations for claims under the Texas Blue Sky Laws, TEX. REV. CIV. STAT. ANN. art. 581, § 33(H)(2)).  ""Unless the evidence is such that reasonable minds may not differ as to its effect, the question as to whether a party has exercised diligence in discovering fraud is for the jury." *Id.* (quoting *Ruebeck v. Hunt*, 176 S.W.2d 738, 740 (Tex. 1944)). "In moving for summary judgment on the time bar issue, [Woodbury] assumed the burden of conclusively establishing that [the plaintiffs] knew or should have known, with the exercise of reasonable diligence, of the alleged fraud." *See id.* at 554 (quotation marks omitted).

14

The summary judgment evidence, taken in the light most favorable to the plaintiffs, does not conclusively establish that the plaintiffs knew or should have known about Mierendorf's allegedly deceptive acts or practices before June 8, 2011. If the claims accrued in 2008, as Woodbury argues, they are time barred. If the claims accrued in 2012, as the plaintiffs argue, they are not barred. Factual disputes material to determining this issue preclude dismissal of the Texas Insurance Code claims at this stage.

### 2.      The Accrual Date for the Fraud Claims

"[W]here fraud is alleged, [the Texas Supreme Court] ha[s] granted the claimant the benefit of deferring the cause of action until the claimant discovered or should have discovered the fraud." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). In a fraud case, the "statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence." *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997) (citing *Ruebeck*, 176 S.W.2d at 739); *see also Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 216 (Tex. 2011); *Estate of Stonecipher*, 591 S.W.2d 806, 809 (Tex. 1979) (Texas "courts have consistently held that fraud vitiates whatever it touches, and that limitations begin to run from the time the fraud is discovered or could have been discovered by the defrauded party by exercise of reasonable diligence. Reasonable diligence is a question of fact." (citations omitted)).

For the same reasons discussed in relation to the Insurance Code claims, when the fraud claims accrued also presents factual disputes material to determining whether the plaintiffs knew or should have known about Mierendorf's alleged fraud before June 8, 2009. If the claims accrued in 2008, as Woodbury argues, they are time barred. If the claims accrued in 2012, as the plaintiffs argue, they are not. The factual disputes preclude the dismissal of the fraud claims at this stage.

### 3.        The Accrual Dates for the Contract-Breach and Negligence Claims

The remaining claims are for breach of oral contract, negligence, and negligent misrepresentation.  The general rule is that "'a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred.'"  *TGI Ins. Co v. Aon Re, Inc.*, 521 F.3d 351, 355 (5th Cir. 2008) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)).  The parties do not appear to dispute that, if this default rule applies, the remaining claims are time barred.  The record shows that Mierendorf induced the plaintiffs to purchase the Hartford annuities between 2003 and 2007, well before the earliest accrual date in June 2009.

The plaintiffs invoke two distinct, common-law exceptions to the general rule:  fraudulent concealment and the discovery rule.  They are addressed in turn.

#### a.        Fraudulent Concealment

"A defendant's fraudulent concealment of wrongdoing may toll the statute of limitations after the cause of action accrues."  *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011).  The doctrine of fraudulent concealment is "equitable" and "fact-specific."  *Id.*  It "resembles equitable estoppel" because it "'estops the defendant from relying on the statute of limitations as an affirmative defense to [the] plaintiff's claim.'"  *Computer Assocs.*, 918 S.W.2d at 456 (alteration in original) (quoting *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983)).

"A party asserting fraudulent concealment must establish an underlying wrong, and that 'the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff.'"  *Marshall*, 342 S.W.3d at 67 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 888 (Tex. 1999)); *see also Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011) (the plaintiff must "prove [the

defendant] actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong." (quotation marks omitted)).  Fraudulent concealment does not toll the statute of limitations against a defendant who neither knows that the plaintiff was wronged nor participates in concealing the wrongdoing.  *See Ratliff*, 998 S.W.2d at 888.  The doctrine "only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Marshall*, 342 S.W.3d at 67; *cf. Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1528 (5th Cir. 1988) (when a defendant moves for summary judgment on the basis of limitations, the plaintiff must prove that (1) the defendant concealed "the conduct complained of" and (2) the plaintiff "failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim.").

The summary judgment record does not support the plaintiffs' reliance on fraudulent concealment to toll the running of limitations on the remaining claims.  There is no evidence showing or supporting an inference that Woodbury knew about Mierendorf's misleading or untrue statements to the plaintiffs.  Nor is there evidence showing or supporting an inference that Woodbury worked to conceal the fraudulent nature of Mierendorf's representations from them.  This exception to the general rule does not apply.

### b.   The Discovery Rule

Under Texas law, if an injury is both (1) inherently undiscoverable and (2) objectively verifiable, the statute of limitations runs "not from the date of the [defendant's] wrongful act or omission, but from the date the nature of the discovery was or should have been discovered by the plaintiff." *Weaver v. Witt*, 561 S.W.2d 792, 793–94 (Tex. 1977); *see also HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998).  "The [Texas] Legislature has adopted the discovery rule in some cases." *Via Net v. TIG Ins. Co*, 211 S.W.3d 310, 313 (Tex. 2006).  "While the Legislature's silence

17

on accrual in most cases leaves that question to the courts, [the Texas Supreme Court has] restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes." *Id.* The defendant asserting the limitations defense must "(1) conclusively prove when the cause of action accrued and (2) negate the discovery rule by proving as a matter of law there is no genuine issue of fact concerning when the plaintiffs discovered or should have discovered the nature of the injury." *Hendricks v. Thornton*, 973 S.W.2d 348, 365–66 (Tex. App.—Beaumont 1998, pet. denied), *superseded by statute on other grounds*, 1999 TEX. SESS. LAW SERV. CH. 950.

An "inherently undiscoverable" injury "need not be absolutely impossible to discover." *S.V.*, 933 S.W.2d at 7. Instead, the injury must be "by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.* "The inquiry focuses categorically on the type of injury alleged rather than on the circumstances of the particular case." *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009). Unlike the fraudulent-concealment defense, the discovery rule is a "legal question . . . decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable." *Via Net*, 211 S.W.3d at 314 (emphasis in original).

Courts applying Texas law have held that tortious injuries allegedly caused by misrepresentations about investments are often objectively verifiable but inherently undiscoverable within the limitations period. *See Hendricks*, 973 S.W.2d at 365 ("[I]t is most unlikely that an investor would know that representations about an investment program allegedly made, or authorized to be made, by an auditor/accountant in a brochure, prospectus, or tax opinion were false or misleading at the time of investment. Otherwise, the investors would not have invested."); *Hanley v. First Inv'rs Corp.*, 793 F. Supp. 719, 723 (E.D. Tex. 1992) ("The gravamen of plaintiffs'

complaint is not that the defendants sold them securities which fluctuated in value, but rather that the defendants fraudulently misrepresented the risks associated with these securities. While there may be cases where the fluctuations are so dramatic that a reasonable investor who was aware of the fluctuations could be held to be on notice of fraud for purposes of the discovery rule, this is not so obvious a case. Accordingly, a genuine and material question for the jury remains.").

*In re Jackson National Life Insurance Co. Premium Litigation*, 107 F. Supp. 2d 841 (W.D. Mich. 2000), is instructive. The district court, applying Texas law, concluded that the plaintiffs' tortious injuries caused by a broker's misleading representations about the performance of life-insurance policies were inherently undiscoverable. The court reasoned that:

> [w]here plaintiffs allegedly purchased policies based on illustrations of projected performance and on sales broker representations to the effect that the policies would be "paid-up" after a stated number of premium payments; and where the policies were not made available to them until some weeks or months after they had purchased the policies and paid the initial premium; and where the failure of the policies to perform as represented would not become apparent until several years later when unexpected additional premium payments were required, the alleged misrepresentations can fairly be characterized as unlikely to be discovered within the prescribed period despite due diligence . . . .

*Id.* at 854 (quotation marks omitted). The court pointed to Texas cases holding that injuries resulting from reliance on expert advice are often inherently undiscoverable. *See Murphy v. Campbell*, 964 S.W.2d 265, 270–71 (Tex. 1997); *Hendricks*, 973 S.W.2d at 364–65. In *Murphy*, the Texas Supreme Court held that the discovery rule delayed the accrual of a common-law action for accounting malpractice based on a tax advisor's faulty advice. The court explained:

> A person suffers legal injury from faulty professional advice when the advice is taken. However, the discovery rule may apply to delay accrual of a cause of action complaining of such advice because of the difficulty a lay person has in knowing of the fault in the advice. Legal malpractice, for example, is inherently undiscoverable because "'[i]t is unrealistic to expect a layman client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney.'"

19

> *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex.1988) (citation omitted); *S.V.*, 933
> S.W.2d at 6.  Thus, the accrual of a legal malpractice claim, including a claim for
> faulty tax advice, is governed by the discovery rule.  The same rule should apply
> whether the advisor is a lawyer or an accountant.  It is most unlikely that a client
> would know that tax advice was faulty at the time he received it.  Indeed, the very
> reason to seek expert advice is that tax matters are often not within the average
> person's common knowledge.

*Murphy*, 964 S.W.2d at 270–71.

Like the plaintiffs in *Murphy*, the plaintiffs here suffered injuries based on the misrepresentations of an expert whose advice they relied on.  To be sure, the plaintiffs received quarterly statements showing a decline in the value of their annuities, which was inconsistent with the performance Mierendorf had promised.  But although the account statements showed that their investments lost value in 2008, the plaintiffs were still able to make the annual withdrawals Mierendorf had guaranteed.  And the plaintiffs routinely relied on Mierendorf for advice and guidance.  As the annuities' values declined, he told them not to worry, that their investments were secure, and that they would recoup any temporary losses.  Mierendorf "conceal[ed] both [the] source and [the] injury from [his] victim[s]."  *Beavers*, 566 F.3d at 440.  Even though the plaintiffs could have contacted Hartford or Woodbury directly about their investment losses, Texas law recognizes that it is "unrealistic to expect a layman client" to identify fault in the advice of a purported expert, such as an attorney or an accountant.  *See Murphy*, 964 S.W.2d at 270–71.

Woodbury argues that cases such as *Hendricks* and *Hanley* are different, but it has not offered a principled basis on which to distinguish them.  It reads *Hendricks* as strictly limited to claims by nonclient third parties against accountants based on accounting malpractice, and it contends that the plaintiffs in *Hanley*, unlike the plaintiffs here, did not receive either prospectuses or quarterly account statements reflecting their investments' value and performance.  (Docket Entry

20

No. 41 at p. 27–28).

The question is whether the tortious injury suffered—the loss of money based on negligent misrepresentations, both when the investment decision was made and over time, as the investment declined in value—is the type of injury that is unlikely to be discovered within the two-year limitations period despite due diligence. The case law shows that a layperson's reliance on expert advice later actionable in tort—including advice about sophisticated financial instruments from a broker—may make this type of injury inherently undiscoverable within two years. The case law recognizes the common-sense intuition that those not skilled in finance rely heavily on experts to inform their decisions. When that advice is negligent or otherwise tortious, the ability to identify an injury within the limitations period, even with efforts to gain information, is severely diminished. *Murphy*, 964 S.W.2d at 270–71; *Hendricks*, 973 S.W.2d at 365; *Hanley*, 793 F. Supp. at 723; *In re Jackson*, 107 F. Supp. 2d at 854. The plaintiffs' financial inexperience and Mierendorf's repeated reassurances when the plaintiffs did question him about the decline in value shown on the statements they received, support finding that the injuries were of a type that is inherently undiscoverable within the limitations period.

The injuries the plaintiffs suffered from Mierendorf's allegedly tortious conduct are clearly objectively verifiable. The annuities declined in value, and the losses can be quantified. *See Murphy*, 964 S.W.2d at 271. Woodbury argues that the record shows that the value of the annuities actually increased over time and that the losses were caused when the plaintiffs withdrew money. But the plaintiffs' claims are based on Mierendorf's allegedly negligent misrepresentations, which included assurances that the plaintiffs would be able annually to withdraw money from the annuities without suffering a decline in value.

21

The injuries from the negligence and negligent-misrepresentation claims are inherently undiscoverable and objectively verifiable.  The discovery rule applies.  The claims accrued when the plaintiffs knew or in the exercise of ordinary diligence should have known of the wrongful act that caused their legal injury.  For the same reasons discussed in relation to the Insurance Code claims, there are factual disputes material to determining whether the plaintiffs knew or should have known about Mierendorf's alleged negligence before June 8, 2011.  If the claims accrued in 2008, as Woodbury argues, they are time barred.  If the claims accrued in 2012, as the plaintiffs argue, they are not barred.  The factual disputes preclude the dismissal of the negligence claims at this stage.

The injuries the plaintiffs suffered from the alleged breach of oral contract present a closer question under the discovery rule.  Although the discovery rule turns on the "type[] of injury, not [the] cause[] of action," *Via Net*, 211 S.W.3d at 314, the Texas Supreme Court has, on at least three occasions, refused to apply the discovery rule to defer the accrual date on a claim of breach of contract, *see id.* at 314–15; *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001); *HECI*, 982 S.W.2d at 888.  The Fifth Circuit applies this rule in cases arising under Texas law. *Beavers*, 566 F.3d at 441.

For the purpose of the discovery rule, a breach-of-contract cause of action appears to be treated differently than tort causes of action.  One reason is that "[c]ontracting parties are generally not fiduciaries," and "due diligence requires that each protect its own interests."  *Via Net*, 211 S.W.3d at 314.  "Due diligence may include asking a contract partner for information needed to verify contractual performance."  *Id.*  "[F]ailing to even ask for such information is not due diligence."  *Id.*  A second reason is that the four-year limitations period for a breach-of-contract

22

claim makes it a "rare" case in which "diligent contracting parties [cannot] generally discover any breach during the relatively long . . . limitations period provided for such claims." *Id.* at 315.

There is no need to reach this question, however, because the record shows that, even if limitations does not bar the breach-of-oral-contract claims, the undisputed evidence allows the court to resolve the claims as a matter of law.

## C.    The Contract Claims

"The elements of a breach of contract claim are: (1) a valid contract, (2) plaintiff performed or tendered performance, (3) defendant breached the contract, and (4) plaintiff was damaged as a result of the breach." *Thornton v. Dobbs*, 355 S.W.3d 312, 316 (Tex. App.—Dallas 2011, no pet.). "The following elements are required for the formation of a valid and binding contract: (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Id.* "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Id.* "In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding the communications." *Id.* "The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind." *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). "It is not enough that one party thinks there was a contract; they must show that their intentions to contract were expressed in a manner that the court is capable of understanding." *Id.* at 605.

The plaintiffs argue that they entered into an oral contract with Woodbury when Mierendorf, acting on Woodbury's behalf, offered to invest in allegedly risk-free Hartford annuities for them in

23

exchange for transferring their retirement savings into a Woodbury account.  (Docket Entry No. 46 at p. 27).  There is no record evidence that the plaintiffs intended to enter an oral contract with Mierendorf, acting as Woodbury's agent.  The plaintiffs testified that they understood the terms of their annuity investments to be governed by the written contract Mierendorf gave them and that they signed.  (Docket Entry No. 41, Ex. 9 at p. 34–35; Docket Entry No. 41, Ex. 16 at p. 22–23; Docket Entry No. 41, Ex. 28 at p. 20–21; Docket Entry No. 41, Ex. 29 at p. 34).  There is no evidence showing or supporting an inference that the plaintiffs understood Mierendorf's oral representations as an offer to enter into an oral contract, and there is no evidence showing or supporting an inference that the plaintiffs assented to that offer "in a manner that the court is capable of understanding." *Copeland*, 3 S.W.3d at 605.

There are no factual disputes material to determining that the plaintiffs did not enter into an oral contract with Woodbury.  Summary judgment is granted dismissing these breach-of-contract claims.

### D.      The Economic-Loss Rule

Woodbury argued that if the court did not dismiss the contract-breach claims, the plaintiffs' tort-based claims would necessarily have to be dismissed under the economic-loss rule.  (Docket Entry No. 41 at p. 33).  Because the court dismissed the contract claims, Woodbury's argument is now moot.  Woodbury may reassert the argument if it seeks to rely on the economic-loss rule even in the absence of the contract-based claims.  *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (the economic-loss rule bars tort claims "[w]hen the injury is only the economic loss to the subject of a contract itself.").

### III.      Conclusion

Woodbury's motion for summary judgment, (Docket Entry No. 41), is granted in part and denied in part.  The plaintiffs' claims for breach of oral contract are dismissed with prejudice.  The plaintiffs' claims for violation of the Texas Insurance Code, negligence, negligent misrepresentation, and fraud remain.  Docket call is set for **April 4, 2016 at 4:00 p.m.** in Courtroom 11-B.

SIGNED on March 21, 2016, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

25