United States District Court
Southern District of Texas

**ENTERED**

September 13, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| VERNON GALLIER, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-888 |
| | § | |
| WOODBURY FINANCIAL | § | |
| SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON POSTTRIAL MOTIONS**

The parties tried this case to a jury in June 2016.  The jury returned a verdict in the plaintiffs' favor, awarding them damages for their financial adviser's misrepresentations about the annuities they purchased through his employer, Woodbury Financial Services, Inc.  The jury found that the adviser, David Mierendorf, was acting within the scope of his authority from Woodbury when he made the misrepresentations; that limitations did not bar the claims; and that Woodbury was liable for violations of the Texas Insurance Code and for fraudulent and negligent misrepresentations.  The jury awarded damages for fraud and negligence based on alternative benefit-of-the-bargain and out-of-pocket damage measures, as well as damages for Woodbury's knowing violations of the Texas Insurance Code, TEX. INS. CODE § 541.152(b).  (Docket Entry No. 108).

"[U]nder Texas law, a plaintiff who pleads alternative theories of recovery may elect [] remedies after the verdict."  *Fisher v. Miocene Oil & Gas Ltd.*, 335 F. App'x 483, 486 n.4 (5th Cir. 2009) (citing *State v. Fiesta Mart, Inc.*, 233 S.W.3d 50, 56 n.4 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)).  The plaintiffs moved to enter judgment and elected benefit-of-the-bargain damages. (Docket Entry No. 110).  They also sought pre- and postjudgment interest, attorney's fees,

costs, and conditional appellate fees.

Woodbury responded by moving for judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50(b), arguing that limitations barred the plaintiffs' claims and that the plaintiffs had failed to prove recoverable damages.  Woodbury also argued that the plaintiffs are not entitled to attorney's fees, interest, or costs.  The plaintiffs replied, and the court heard oral argument.  (Docket Entry Nos. 115, 117, 119).

At oral argument, the court ordered the parties to submit supplemental briefs addressing the limitations issue.  While the original briefs focused on the Fifth Circuit's recent unpublished decision in *Rowten v. Wall St. Brokerage, L.L.C.*, 646 F. App'x 379 (5th Cir. 2016) (per curiam), the supplemental briefs canvassed state- and federal-court cases applying similar limitations standards to similar allegations against the kind of "rogue" broker the jury found  Mierendorf to be—a finding Woodbury does not dispute.

The limitations issue has been in this case from the outset.  Because the outcome is close and fact-intensive, the court rejected—or, more precisely, deferred deciding—Woodbury's limitations arguments at the motion-to-dismiss, summary-judgment, and  judgment-as-a-matter-of-law stages. Instead, the court found factual allegations and evidence that required a fully developed and well-presented record to resolve.  (Docket Entry Nos. 32, 55, 112).  The good lawyers on both sides have presented the factual record and legal analysis the court hoped for.  The four plaintiffs testified extensively about their annuity purchases and their pre- and post-purchase communications with Mierendorf and Woodbury.

The case law, while heavily dependent on the facts of each case, presents a consistent theme. A party arguing that limitations did not accrue until long after the purchase, or invoking fraudulent concealment or the discovery rule as a basis to toll limitations, must act reasonably.  A plaintiff acts

unreasonably as a matter of law by relying on a broker's oral representations that clearly conflict with the brokerage house's written risk disclosures or financial-performance information. Applying this rule, case after case holds that a plaintiff cannot reasonably rely on a broker's oral promise that her investment is "risk-free" or "guaranteed" in the face of documents, including subscription agreements and account statements, describing risks of loss or showing financial performance inconsistent with that promise. If the reliance is unreasonable, courts hold that, as a matter of law, the plaintiff was on notice of her claims before limitations ran, and her claims are barred.

The case law presents a continuum of factual variations. At one end, the contradictions between the statements and information in the brokerage house's documents and the "rogue" broker's oral promises are so stark as to make the limitations bar clear. At the other end, the documents are sufficiently unclear or ambiguous as to make the dispute over when a plaintiff was on notice of her claims, and therefore subject to the limitations bar, an issue the finder of fact needs to decide.

Based on the record; the motions, responses, and supplemental briefs; the applicable law; and counsels' arguments, the court must deny the plaintiffs' motion for judgment, (Docket Entry No. 110), and grant Woodbury's motion for judgment as a matter of law, (Docket Entry No. 115). No later than September 29, 2016, the parties must submit a proposed final judgment consistent with this Memorandum and Order.

The reasons for this ruling are set out below.

## I.     The Legal Standard Under Rule 50(b)

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (quoting *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir.

2008) (per curiam)) (internal quotation marks omitted).  Under Rule 50(b) of the Federal Rules of Civil Procedure, "[a] motion for judgment as a matter of law should be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party."  *Id.* (internal quotation marks omitted).  In conducting this review, the district court "accord[s] great deference to the jury's verdict."  *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998).  The court "view[s] the entire record in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and 'leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury.'"  *Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 378 (5th Cir. 1999) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir. 1994)).  A court may grant a motion for judgment as a matter of law "[o]nly when the facts and reasonable inferences are such that a reasonable juror could not reach a contrary verdict . . . ."  *Baltazor*, 162 F.3d at 373.

A district court may review a party's postverdict motion for judgment as a matter of law under Rule 50(b) only if the party first moved for a directed verdict under Rule 50(a) at the conclusion of the evidence.  *See Allied Bank-West v. Stein*, 996 F.2d 111, 114–15 (5th Cir. 1993); *see also United States ex rel. Wallace v. Flintco Inc.*, 143 F.3d 955, 960 (5th Cir. 1998).  A Rule 50(a) motion is a prerequisite to the district court's review of a postverdict motion under Rule 50(b) and is "virtually jurisdictional."  *Stein*, 996 F.2d at 114–15 (quoting *Perricone v. Kan. City S. Ry. Co.*, 704 F.2d 1376, 1380 (5th Cir. 1983)).  The parties do not dispute that Woodbury moved for judgment as a matter of law under Rule 50(a) based on limitations and damages.  (Docket Entry No. 112).

## II.    Analysis

4

### A.       Background

Texas law governs the limitations issues.  *See* Tex. Civ. Prac. & Rem. Code § 16.004(a)(4) (fraud—four years); *id.* § 16.003(a) (negligence and negligent misrepresentation—two years); Tex. Ins. Code § 541.162 (Texas Insurance Code—two years).  The parties agree that: (1) the claims with a two-year statute of limitations are time-barred if they accrued before June 8, 2011; and (2) the claims with a four-year statute of limitations are time-barred if they accrued before June 8, 2009.

Woodbury's motion for summary judgment argued that limitations began to run when the plaintiffs purchased the annuities and received documents describing the risks, because that was when the alleged losses occurred.  (Docket Entry No. 41 at p. 25).  In the alternative, Woodbury argued that limitations began to run in 2008, when the plaintiffs received Woodbury account statements showing significant actual investment losses that were inconsistent with Mierendorf's oral promises that they could withdraw a guaranteed 7% annually without diminishing the principal value.  (*Id.* at p. 30).

The plaintiffs responded that the losses did not occur on the annuity-purchase dates and that they reasonably relied on Mierendorf's promises before and after they bought the annuities.  (Docket Entry No. 46 at p. 17).  The plaintiffs argue that limitations did not accrue until 2012, when they first learned that Mierendorf had left Woodbury under bizarre circumstances and that the investments, while still containing sufficient value to provide the promised 7% return for some period, would not provide the promised lifetime guarantee of a 7% return and fully preserved principal.

Woodbury argues that the written risk disclosures the plaintiffs received before they made the investments in 2003 and the account statements showing significant principal-value losses in 2008 put them on notice that Mierendorf's statements were false or unreliable.  The plaintiffs

emphasize that they had no meaningful investment experience and trusted Mierendorf to give them accurate information and answer all their questions about the annuities. The plaintiffs argue that the risk disclosures in the purchase documents were neither so clear nor inconsistent with Mierendorf's promises as to put them on inquiry notice of their claims. Acknowledging that the account statements they received in 2007 and 2008 showed significant losses that Mierendorf had told them could not and would not occur, the plaintiffs emphasize that they acted reasonably in seeking and relying on his explanations. Those explanations reassured the plaintiffs that the annuities were guaranteed to rebound and to deliver the 7% return with the principal intact. In short, they argue that Mierendorf lulled them by assuaging their fears, causing them to disregard the account statements showing significant actual losses in principal value.

The plaintiffs argued that even after 2008, they were reasonable in continuing to rely on Mierendorf's oral assurances and representations. They argue that they did not know, and could not reasonably have known, of Mierendorf's fraud until 2012. That was when they learned that Mierendorf had left Woodbury and after a different financial adviser, Carri Tacker, reviewed their accounts and told them the truth about the annuities' present and future risks and value.

In response to Woodbury's repeated efforts to end this case on limitations, the court analyzed the limitations period separately for each claim, including the statutory claims under the Texas Insurance Code and the common-law fraud, misrepresentation, contract breach, and negligence claims. For both the statutory and common-law claims, the limitations period begins to run when a plaintiff is on inquiry notice, or through reasonable diligence should be on inquiry notice, of the alleged wrongdoing. The court analyzed the contract breach and negligence claims under the general rule that "a cause of action accrues when a wrongful act causes some legal injury, even if

6

the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *TGI Ins. Co v. Aon Re, Inc.*, 521 F.3d 351, 355 (5th Cir. 2008) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)) (internal quotation marks omitted).

The plaintiffs invoked two common-law exceptions to the general rule: fraudulent concealment and the discovery rule.  The court held that the fraudulent-concealment exception did not apply but that the discovery rule could.  The limitations period for the statutory claims is subject to the discovery rule by the explicit instruction of the Texas legislature.  TEX. INS. CODE § 541.162(a); *Glenn v. L. Ray Calhoun & Co.*, 83 F. Supp. 3d 733, 746-47 (W.D. Tex. 2015).  Under Texas law, if an injury is both inherently undiscoverable and  objectively verifiable, the statute of limitations does not run "from the date of the [defendant's] wrongful act or omission, but from the date the nature of the discovery was or should have been discovered by the plaintiff." *Weaver v. Witt*, 561 S.W.2d 792, 793–94 (Tex. 1977); *see also HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998).  Applying the discovery rule is a "legal question . . . decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable." *Via Net v. TIG Ins. Co*, 211 S.W.3d 310, 314 (Tex. 2006).

The court relied on cases applying Texas law to hold that tortious injuries allegedly caused by misrepresentations about investments are often objectively verifiable but inherently undiscoverable within the limitations period. *See  In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 107 F. Supp. 2d 841, 854 (W.D. Mich. 2000); *Hanley v. First Inv'rs Corp.*, 793 F. Supp. 719, 723 (E.D. Tex. 1992); *Murphy v. Campbell*, 964 S.W.2d 265, 270–71 (Tex. 1997); *Hendricks v. Thornton*, 973 S.W.2d 348, 365–66 (Tex. App.—Beaumont 1998, pet. denied), *superseded by statute on other grounds*, 1999 TEX. SESS. LAW SERV. CH. 950.  The court analyzed the application

of the discovery rule in the reported cases and concluded that "[t]he case law recognizes the common-sense intuition that those not skilled in finance rely heavily on experts to inform their decisions.  When that advice is negligent or otherwise tortious, the ability to identify an injury within the limitations period, even with efforts to gain information, is severely diminished." (Docket Entry No. 55 at p. 21).

Because the discovery rule could apply to the type of injury alleged, *see Via Net*, 211 S.W.3d at 314, the limitations standard for the contract-breach and negligence claims was the same as the standard for the Texas Insurance Code and fraud claims.  The claims accrued when the plaintiffs knew, or in the exercise of reasonable diligence should have known, of the wrongful act that caused their legal injury.  The court found factual allegations sufficient to raise, and factual disputes material to deciding, when the plaintiffs were on inquiry notice of Mierendorf's and Woodbury's alleged wrongdoing.[1]  Importantly, the court did not rule pretrial that, as a matter of law, there was, or was not, sufficient evidence to support a finding that limitations did not begin to run until 2012.

The case proceeded to trial.  Jury Question Number 5 asked: "By what date should the Plaintiffs, in the exercise of reasonable diligence, have discovered Mr. Mierendorf's misconduct?" (Docket Entry No. 108 at p. 7).  For each plaintiff, the jury chose among three answers: on or before June 8, 2009; on or before June 8, 2011; or after June 8, 2011.  The jury found that each plaintiff should have discovered, in the exercise of reasonable diligence, the alleged wrongdoing after June 8, 2011.  (Docket Entry No. 108 at p. 7).  Woodbury now argues for judgment notwithstanding the verdict based on limitations, citing *Rowten v. Wall St. Brokerage, L.L.C.*, 646 F. App'x 379 (5th Cir.

---

[1]  The court granted Woodbury summary judgment on the contract-breach claims for reasons independent from limitations.  (Docket Entry No. 55 at p. 23–24).

8

2016) (per curiam), and the cases gathered in its supplemental brief.

**B.    When Did the Causes of Action Accrue?**

An inquiry-notice standard governs the accrual dates.  Determining when a plaintiff was on inquiry notice of fraud is a "fact-intensive inquiry . . . typically appropriate for consideration by a jury."  *See Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006).  "'Unless the evidence is such that reasonable minds may not differ as to its effect, the question as to whether a party has exercised diligence in discovering fraud is for the jury.'"  *Id.* (quoting *Ruebeck v. Hunt*, 176 S.W.2d 738, 740 (Tex. 1944)) (internal quotation marks omitted).

A plaintiff is on inquiry notice "when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning."  *Sudo Props., Inc. v. Terrebonne Parish Consol. Gov't*, 503 F.3d 371, 376 (5th Cir. 2007) (quoting *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 216 (3d Cir. 2007)) (internal quotation marks omitted).  "Investors are not free to ignore 'storm warnings' which would alert a reasonable investor to the possibility of fraudulent statements or omissions . . . ."  *Jensen v. Snellings*, 841 F.2d 600, 607 (5th Cir. 1988).  If, after discovering 'storm warning' facts that suggest possible wrongdoing, "a reasonable person would inquire further, a plaintiff must proceed with a reasonable and diligent investigation of the facts the plaintiff has learned and is charged with the knowledge of all facts such an investigation would have disclosed."  *Rowten*, 646 Fed. App'x at 382 (quoting *Topalian v. Ehrman*, 954 F.2d 1125, 1133 (5th Cir. 1992)) (internal quotation marks omitted).  This is an affirmative duty: a plaintiff "cannot close his eyes and simply wait for facts supporting such a claim to come to his attention."  *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 409 (5th Cir. 1998).  "[A]n objective standard [applies] to determine what an investor would have known

through the exercise of reasonable diligence." *Rowten*, 646 Fed. App'x at 384.[2] The inquiry focuses

on the total mix of information in a plaintiff's possession: its combined weight is the criterion, even

if individual pieces of information within the mix might not independently suffice. *See Jensen*, 841

F.3d at 607–08.

Woodbury argues that limitations bars the plaintiffs' claims as a matter of law because the

claims accrued when they signed the annuity contracts. Ms. Harrison purchased in 2003; Ms.

Temple purchased in 2005; Mr. Gallier purchased in 2004; and Ms. Gallier in 2007. In the

alternative, Woodbury argues that the claims accrued in 2008, when the plaintiffs received account

statements showing investment performance inconsistent with Mierendorf's oral promises. The

plaintiffs argue that the annuity contracts and related disclosures did not contradict Mierendorf's

representations so clearly as to trigger a duty to investigate at the time they purchased the annuities.

They argue that they satisfied any duty to investigate that arose in 2008 by asking Mierendorf about

the account losses and relying on his responses. They argue that these responses lulled them into

---

[2] In their briefs and at oral argument, the plaintiffs emphasized that they are unsophisticated and inexperienced investors. *Rowten* and other Fifth Circuit cases make clear, however, that inquiry notice is an objective standard. 646 Fed. App'x at 384; *Jensen*, 841 F.2d at 608. The jury instructions in this case were consistent, referring to what the plaintiffs should have known "in the exercise of *reasonable* diligence." (Docket Entry No. 108 at p. 7 (emphasis added)).

The inquiry-notice standard asks a different question than whether to apply the discovery rule. Whether to apply the discovery rule turns on the categorical nature of the injury alleged, an objective issue. The question involves subjective considerations to the extent that a layperson is unlikely to discover fraudulent professional advice when she receives it. *See Murphy*, 964 S.W.2d at 270–71. Although the court relied on the case law to apply the discovery rule, applying that rule ultimately triggers the 'objectively reasonable' inquiry-notice standard. *Altai*, 918 S.W.2d at 455; *DeWolf v. Kohler*, 452 S.W.3d 373, 391 (Tex. App.—Houston [14th Dist.] 2014, reh'g overruled) (the discovery rule "delay[s] accrual of the claim only during the time it would take for a reasonably diligent plaintiff to investigate and discover the cause of the injury."); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010) ("[T]reatise writers now describe the discovery rule as allowing a claim to accrue when the litigant first knows or with due diligence should know facts that will form the basis for an action." (quotation marks omitted)).

continuing to believe that their investments remained "safe" and risk-free.

The court concludes that the plaintiffs were on inquiry notice as a matter of law before June 8, 2009, and that they were not reasonable in relying on Mierendorf's 2008 explanations. The plaintiffs then had multiple pieces of information that, taken together, would necessarily alert a reasonable investor of the possibility of Mierendorf's fraud, and required them to do more than ask him about the losses.

> **1.  The plaintiffs were on inquiry notice when they received account statements showing significant investment losses; their communications with Mierendorf did not discharge their duty to perform a diligent investigation.**

The total mix of information available to the plaintiffs throughout 2008 and into the first half of 2009–well before the June 8, 2009 limitations cutoff–would have put a reasonable investor on inquiry notice as a matter of law. First, the trial evidence included the quarterly account statements Hartford sent to each plaintiff. (Docket Entry No. 129, Ex. 6–9). The account statements showed that the amount discussed under the first benefit rider of the annuity documents declined each quarter after the plaintiffs purchased the annuities. (Docket Entry No. 129 at p. 26). Second, the plaintiffs had access to their annuity contracts and written disclosures. These documents contained numerous disclosures inconsistent with Mierendorf's oral representations.

The account statements are sufficient, without more, to support judgment as a matter of law that the plaintiffs were on inquiry notice when they received those statements. Receiving information demonstrating that a purportedly risk-free or guaranteed investment is suffering substantial losses triggers a duty to investigate. *See Jensen*, 841 F.2d at 607; *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1342-44 (8th Cir. 1980) (the plaintiff was on notice when she received

account statements reflecting losses on purportedly risk-free investments); *In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 272–73 (S.D.N.Y. 1997) (same).  The rule is not strictly limited to documents showing lost account value.  Courts generally hold that receiving information reflecting investment performance broadly inconsistent with the counterparty's representations about the character of the investment triggers inquiry notice.  *See Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 253–54 (3d Cir. 2001) (the plaintiff was on notice that investments had been misrepresented after receiving financial updates showing "large swings in [investment] distributions and net asset values . . . inconsistent with low-risk, conservative investments"); *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222, 224 (1st Cir. 1997) (same).

Here, the account statements clearly showed that the plaintiffs' investments lost substantial sums beginning in late 2007 and continuing into 2008.  (Docket Entry No. 129, Exs. 6–9).  These declines in value were clearly inconsistent with Mierendorf's oral promises.  Mierendorf promised a guaranteed, risk-free investment; the account statements showed a risky financial product. Mierendorf promised that the plaintiffs had bought "insurance" that would preserve their principal investment to pass on to their children and grandchildren, and that the annuities would experience annual growth despite the plaintiffs' withdrawals.  The account statements showed that the benefit rider had shrunk each quarter and continued to suffer declining balances.  The plaintiffs recognized as much: each testified that they knew that their accounts had lost money and that the losses greatly concerned them.  Each acknowledged that the losses were inconsistent with Mierendorf's promises of guaranteed investments that were risk-free and would perpetually grow.

But the court need not rely solely on the plaintiffs' receipt of the account statements.  The plaintiffs also had the written disclosures provided when they opened their annuity accounts.

12

Woodbury argues that these disclosures were independently sufficient to trigger inquiry notice, because "[i]t is undisputed that the prospectuses and annuity applications contained risk disclosures and warnings that, had plaintiffs read them, revealed that Mierendorf's purported guarantees were not in effect." (Docket Entry No. 115 at p. 13). As explained in more detail below, the risk-disclosure documents were not sufficient in and of themselves to put the plaintiffs on inquiry notice as a matter of law at the time of purchase. But the documents are part of the total mix of information available to the plaintiffs as of 2008.

The risk-disclosure documents contain numerous statements inconsistent with Mierendorf's representations. The annuity contracts states that the payouts are variable and will fluctuate with the performance of underlying investments. (Docket Entry 129, Exh. 4 at p. 1). The contracts note that investment results are not guaranteed. (*Id.* at pp. 14-15). These warnings echo the disclaimer on the annuity applications: "may lose value." (Docket Entry 129, Exh. 1 at p. 55). These statements are inconsistent with Mierendorf's promise of a guaranteed and risk-free investment.

The plaintiffs respond that the documents also contain statements plausibly consistent with Mierendorf's representations and therefore cannot put them on inquiry notice. As explained later, the court agrees that the documents are not so consistently inconsistent with Mierendorf's representations that they were independently sufficient to put the plaintiffs on notice at the time of purchase. But that does not change the fact that the documents contain numerous statements at odds with Mierendorf's promises. The documents are part of the total mix of information available to the plaintiffs as of 2008. The contract language warning of investment risks, together with the actual materialization of those risks as disclosed over and over in the account statements, would have caused a reasonable investor receiving the account statements to "proceed with a reasonable and

diligent investigation." *See Jensen*, 841 F.3d at 607–08 (assessing warning signs "in their totality"). Because that investigation would have revealed that the annuities were not performing as Mierendorf had promised, and because the plaintiffs are "charged with the knowledge of all facts such an investigation would have disclosed," the plaintiffs were on inquiry notice, as a matter of law, before June 8, 2009. *See id.*

Indeed, the plaintiffs testified that the losses caused them to carry out *some* investigation: they contacted and met with Mierendorf. The plaintiffs testified that at these meetings—which took place either over the phone or in person—Mierendorf reassured them that their investments were safe, that they had insurance, and that the market and their annuity values would rebound and grow. (Docket Entry No. 123 at p. 136–38; Docket Entry No. 127 at p. 9–12, 114–117, 218–19). The plaintiffs testified that they trusted and relied on Mierendorf despite the written account statements they received. (*Id.*). The plaintiffs argue that asking Mierendorf discharged their duty to investigate–that it was reasonable for them to stop investigating after Mierendorf assured them that all was well. Not so.

The account statements the plaintiffs received before June 8, 2009 were so glaringly inconsistent with Mierendorf's representations of a risk-free investment that they "would [have] alert[ed] a reasonable investor to the possibility" of fraud, making continued reliance on his reassurances unreasonable. *See Jensen*, 841 F.2d at 607; *see also Koke*, 602 F.2d at 1342, 1344 (a broker's continuing reassurances that an investment was doing well did not excuse the duty of inquiry when the plaintiff had account statements reflecting significant losses). That is especially true given that Mierendorf's story shifted when the plaintiffs confronted him. Investments that were once "risk-free" and "guaranteed" to never lose value were now "insured" and "safe" because the

14

market would rebound.  If the annuities had performed as he had promised, the principal would not have lost value and the "insurance" the plaintiffs thought they had purchased would have protected the annuities from market fluctuations.  This is precisely the sort of shifting and inconsistent representation that, far from 'lulling' a reasonable investor, should have "dyed the flag raised" by the conflict between Mierendorf's promises and the plummeting account values "an even brighter shade of red." *Topalian*, 954 F.2d at 1134; *see also Jensen*, 841 F.2d at 607, 6099 (a counterparty's representation that an investment remained profitable when the plaintiffs knew it was losing money was a factor increasing, rather than decreasing, the duty to investigate).

Nor does the record show that Mierendorf or Woodbury prevented the plaintiffs from asking more questions about their losses.  Further investigation would have been easy.  A call to a different Woodbury or Hartford representative would have quickly detected, and revealed more details about, Mierendorf's fraud.  *See, e.g.*, *Coleman & Co. Sec., Inc. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288, 308 (S.D.N.Y. 2002) (the plaintiffs "could have discovered the facts underlying the gist of their complaint with virtually any diligence whatsoever, from consulting any source other than [the allegedly "rogue" financial advisor] for basic investment information.").[3]

Among the plaintiffs' strongest cases is *Sudo*, which held that, even though the plaintiff discovered that a defendant's financial projections were "grossly incorrect," that evidence was "not sufficient to create notice inquiry as a matter of law."  503 F.3d at 377 (citing *Breen v. Centex Corp.*, 695 F.2d 907, 912 (5th Cir. 1983)).  *Sudo* is distinguishable.  The facts of the case make the basis

---

[3] *Compare with, e.g.*, *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1309–10 (9th Cir. 1982) (plaintiff questioned defendant about facts in his exclusive possession, which the defendant intentionally misrepresented).  The court also rejected the plaintiffs' fraudulent-concealment argument on summary judgment.  (Docket Entry No. 55 at p. 17).

for distinguishing it clear.

The plaintiff in *Sudo* purchased a one-third share of an indoor-football team that leased a civic center owned and operated by Terrebonne Parish.  The center's director projected a $182,000 annual profit and told the plaintiff that the team was "doing great" financially.  *Id.* at 373-74.  Shortly after purchasing an interest in the team, the plaintiff learned that costs were higher than projected.  The team lost $400,000 in its first year.  *Id.* at 374.  Two years later, the plaintiff discovered an audio recording revealing that the director had "misled him into investing into the team because [the Parish] desperately needed a tenant at the civic center."  *Id.* at 375.

The Fifth Circuit held that limitations did not begin to run when the plaintiff received written statements showing that the director's profit projections were "grossly incorrect."  *Id.* at 377.  The court reasoned that "[t]here was considerable truth" to the director's statement that the team was "doing great" financially and that the plaintiff had "received mixed information about the accuracy of [the] projections."  *Id.* at 376.  And even though the plaintiff "knew for certain" that the projections "were wrong by a wide margin[,] [h]e had no information that would lead him to suspect that [the director] had deliberately misstated the projections or saddled him with a failing business for some ulterior purpose."  *Id.* at 377.  He "could have easily interpreted the disjunction between [the defendants'] projections and reality to be the fault of [the defendants'] poor judgment," rather than fraud, making it reasonable to infer that "he had simply 'made a bad business decision.'"  *Id.*

Unlike the plaintiff in *Sudo*, the plaintiffs here received quarterly written statements that clearly contradicted Mierendorf's promises.  There is no evidence supporting the verdict that, after June 2009, the plaintiffs were reasonable in continuing to rely on those promises as "considerably true."  The quarterly account statements clearly showed that Mierendorf was wrong, time and again,

16

not only about specific financial "projections" but also about "guarantees" that went to the heart of the investment products he sold.  The nature of Mierendorf's promises, and the extent to which they deviated from the written account statements the plaintiffs received, would have alerted a reasonable investor to at least the *possibility* of fraud, triggering the duty to inquire further and conduct a reasonable investigation.  *Topalian*, 954 F.2d at 1134 (warning signs need only "trigger[] a reason to exercise reasonable diligence").  In short, the statements so "conflict[ed] [with] statements in the written [quarterly updates]" that they should have "served as an obvious indictment of [Mierendorf's] integrity."  *See Sudo*, 503 F.3d at 377 (citing *McGill v. Goff,* 17 F.3d 729, 733 (5th Cir. 1994)).  In the face of this weighty evidence of fraud, the plaintiffs' continued reliance on Mierendorf's representations was unreasonable as a matter of law.[4]

Although the court need not fix a precise date, the evidence shows that, as a matter of law, the plaintiffs should have discovered the facts giving rise to their claims well before June 8, 2009.  The quarterly account statements, together with the annuity contracts and with Mierendorf's inconsistent explanations, would have alerted a reasonable investor to his fraud.  Though the plaintiffs remained in contact with Mierendorf after they purchased the annuities, at some point before June 2009, a reasonably diligent plaintiff in their position would have questioned his rosy reassurances, which were themselves inconsistent with earlier representations he had made.  The court must conclude, as a matter of law, that the plaintiffs' claims are time-barred.

---

[4] At trial, the plaintiffs presented expert testimony that lay investors regularly and reasonably rely on financial advisers to explain complex financial products.  That testimony does not alter the outcome.  The cases dictate that, as a legal rule, a reasonable investor could not continue to rely on Mierendorf after receiving information flatly contradicting his reassurances.  Investors may reasonably rely on their financial advisers in many circumstances, but it is unreasonable to do so in the face of unambiguous evidence of the adviser's fraudulent misrepresentations.  Expert testimony to the contrary cannot override that principle of law.

       **2.**      **The court does not hold that the written disclosure documents given to each plaintiff at the time of purchase were independently sufficient to put plaintiffs on inquiry notice.**

Woodbury also argues that limitations began to run even earlier, when the plaintiffs purchased the annuities, because "[i]t is undisputed that the prospectuses and annuity applications contained risk disclosures and warnings that, had plaintiffs read them, revealed that Mierendorf's purported guarantees were not in effect." (Docket Entry No. 115 at p. 13). As the court noted above, statements in the disclosure documents are in the total mix of information giving rise to the plaintiffs' duty to inquire and investigate. But those documents were not so totally and uncontroversially inconsistent with Mierendorf's representations as to support judgment as a matter of law that the plaintiffs were on notice as of receipt.

Woodbury relies primarily on *Rowten*. In that case, the plaintiff, Charlie Rowten, invested her retirement savings in a REIT. She alleged that two stockbrokers orally promised that the REIT was a "'guaranteed' investment that would earn a minimum 7 percent annual return without loss of, or risk to, principal." *Rowten*, 646 Fed. App'x at 380. She signed a subscription agreement referring to the REIT's prospectus. The prospectus stated that the REIT "involv[ed] a high degree of risk" and that investors should purchase shares only if they could "afford a complete loss." The prospectus included 29 pages of risk factors. *Id.*

Two years after she signed the subscription agreement, Rowten received an account statement showing that she had lost more than half of her principal investment. She conducted internet research and then contacted a REIT representative. The representative told her "that [the] investment was not 'guaranteed.'" *Id.*

18

Rowten and her husband[5] sued the brokers and their firm under Texas law, asserting six causes of action. Each had a four-year statute of limitations that began to run "when a purchaser of securities knew—or in the exercise of reasonable diligence, should have known—of the alleged wrongdoing." *Id.* at 382 (quoting *Topalian*, 954 F.2d at 1133). The Rowtens sued more than four years after signing the subscription agreement, but less than four years after receiving the account statement showing investment losses. *Id.* at 380.

The defendants moved for summary judgment, arguing that "the Subscription Agreement created constructive or inquiry notice of the Prospectus's contents which contradict the alleged representations that the REIT was a guaranteed investment." *Id.* at 380-81. The district court denied summary judgment, the case proceeded to trial, and the defendants again raised limitations in support of a Rule 50(b) motion, which the district court also denied. The Fifth Circuit reversed.

The appellate court held that the limitations period began to run when Rowten signed the subscription agreement, which referred to the Prospectus. The court reasoned that "a 'simple reading' of the Prospectus before or at the time she made her investment 'would have alerted [her] that the written terms of her investment varied from the alleged assertions and promises of' the Defendants." *Id.* at 384 (quoting *Martinez Tapia*, 149 F.3d at 411). The court rejected Rowten's argument that she and her husband were "unsophisticated, inexperienced investors" because "an objective standard [applied] to determine what an investor would have known through the exercise of reasonable diligence." *Id.* The court also rejected the argument that the Rowtens had never "obtained or read the prospectus before investing in the REIT," because "there [were] no allegations

---

[5] Although Charlie Rowten made the investment, her husband was joined as a plaintiff because she used community funds. *Rowten*, 646 Fed. App'x at 380 n.1.

and no evidence that the Defendants concealed the existence of the Prospectus from them." *Id.* Rather, the brokers "told the Rowtens that a Prospectus existed, but that they had run out of copies," and "the Subscription Agreement's repeated references to the Prospectus advised [the Rowtens] of its existence and of its critical importance to understanding [the] investment." *Id.*

The parties do not dispute that this case and *Rowten* involve similar facts and procedural postures. As in *Rowten*, the limitations issue in this case went to the jury, which found that the plaintiffs' claims were not time-barred. As in *Rowten*, the defendant here moved for judgment as a matter of law on limitations, arguing that the written documents the plaintiffs signed contradicted the broker's oral representations. And as in *Rowten*, the plaintiffs here alleged that the broker promised a "'guaranteed' investment that would earn a minimum 7 percent annual return without loss of, or risk to, principal." *See id.* at 380.

But *Rowten* is also different in critical ways. The inconsistencies between the written investment documents and the brokers' oral promises in *Rowten* were so "glaring[ly]" inconsistent that the court could determine, as a matter of law, that a "simple reading" would have put a reasonable person on inquiry notice of the alleged fraud. *See id.* at 380, 384 & n.26 (quoting *Bodenhamer v. Shearson Lehman Hutton, Inc.*, No. 92-2392, 1993 WL 277033, at *3 (5th Cir. July 14, 1993) (unpublished)). The written annuity contract documents here, by contrast, contained inconsistent statements *and* statements plausibly consistent with Mierendorf's promises. The annuity contract's statement that "values provided by this contract . . . are variable and are not guaranteed" contradicted Mierendorf's assurances that the annuities would not lose money on the principal investment, would provide consistent monthly income for life, and would perpetually grow. (Docket Entry No. 41, Ex. 6 at p. 1). But the documents also stated that a different set of

warnings about market volatility did "not apply to income guaranteed under [] The Hartford's Principal First Rider."  (Docket Entry No. 130 at p. 2).  The  benefit rider, in turn, stated that the annuity would provide "a guaranteed income benefit . . . if periodic surrenders do not exceed an amount equal to 7 percent of premium payments." This was consistent with the plaintiffs' testimony that Mierendorf "guaranteed" the security of their principal investments, that the annuities provided "insurance" protecting them from losses, and that they could make annual 7 percent withdrawals that would not diminish the principal value.  (Docket Entry No. 41, Ex. 7 at p. 1).

These plausibly–not clearly–consistent statements in the benefit rider distinguish this case from cases in which a written agreement so directly and clearly contradicted the broker's oral representations that the agreement was independently sufficient to put the plaintiff on inquiry notice. *See, e.g.*, *Mauskar v. Hardgrove*, No. 02-cv-756, 2003 WL 21403464, at *4 (Tex. App.—Houston [14th Dist.] June 19, 2003, no pet.) (the plaintiff "could have discovered his injury by reading the policies," which did not support the insurance agent's oral promises); *see also Martinez Tapia*, 149 F.3d at 409–10; *McGill*, 17 F.3d at 733 ("The terms of the agreement are so contrary to [the plaintiffs'] alleged understanding of the deal that upon review of the document, [the plaintiffs] would have been put on notice of [the] alleged fraud.").  A reasonable jury could conclude that although there were discrepancies between Mierendorf's oral promises and the annuity-contract warnings, the benefit rider was consistent and therefore would not have alerted a reasonable investor to the possibility of fraud.  The court cannot conclude, as a matter of law, that the plaintiffs were on inquiry notice when they signed their annuity contracts.

The plaintiffs argue that annuities are insurance products under the Texas Insurance Code, not securities.  (Docket Entry No. 117 at p. 12).  Citing *Colonial Savings Ass'n v. Taylor*, 544

S.W.2d 116 (Tex. 1976), the plaintiffs argue that they were not required to read their policies and therefore cannot be charged as a matter of law with knowledge of their contents.  To the extent that plaintiffs rely on *Taylor* for a general proposition that they cannot be charged as a matter of law with inquiry notice at *any* point in the course of their dealings with Mierendorf and Woodbury, their argument is unpersuasive.   The plaintiffs have not cited—and the court has not found—a case holding that limitations under the Texas Insurance Code is categorically different from the similarly worded limitations provisions under the Texas and federal securities laws.  *Compare* TEX. INS. CODE § 541.162(a)(2) (limitations begins to run on "the date the person discovered or, by the exercise of reasonable diligence, should have discovered that the unfair method of competition or unfair or deceptive act or practice occurred"), *with* 28 U.S.C. § 1658(b)(1) (limitations begins to run "after the discovery of the facts constituting the violation"), *and* TEX. REV. CIV. STAT. art. 581 § 33(H)(2) (limitations begins to run "after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence").   To the contrary: the Fifth Circuit has treated cases addressing inquiry notice and the discovery rule under Texas law and federal securities law as interchangeable explorations of the same concept.  *E.g.*, *Rowten*, 464 Fed. App'x at 382 & n.11.

To the extent that the plaintiffs rely on *Taylor* solely for the proposition that they were entitled to a jury finding on whether they acted reasonably in failing to read and understand the disclosure documents upon initial receipt, their argument does not affect the analysis or outcome. *Taylor* states an exception to the general rule that a plaintiff is charged with knowledge of the contents of an insurance policy upon receipt.  *See* 544 S.W.2d at 119.  Under *Taylor*, when a plaintiff puts forward evidence showing that she did not read or did not understand an insurance policy when she received it, the reasonableness of that failure is a jury question; if the jury finds that

the failure was reasonable, the presumption that the plaintiff knew the contents of the policy gives way. *Id.* (citing *Fireman's Fund Indemnity Co. v. Boyle General Tire Co.*, 392 S.W.2d 352, 355 (Tex.1965)). *Taylor* is not a limitations case. It deals with the substantive law of negligence, affecting when a plaintiff can and cannot reasonably rely on a defendant's actions. But the narrow question of when a plaintiff has a right to a jury finding on the reasonableness of her failure to read an insurance policy seems applicable in the discovery rule context, and the Fifth Circuit has suggested as much. *See Harbor Ins. Co. v. Urban Const. Co.*, 990 F.2d 195, 201 (5th Cir. 1993) (citing *Boyle*).

The current validity of the *Boyle/Taylor* rule is unclear. More recent Texas intermediate appellate cases often state an unqualified rule that a plaintiff is charged with knowledge of the contents of an insurance policy upon receipt if she does not object to its terms. *E.g.*, *Sabine Towing & Transp. Co. v. Holliday Ins. Agency, Inc.*, 54 S.W.3d 57, 62-63 (Tex. App.—Texarkana 2001, pet. denied); *Ruiz v. Gov't Emps. Ins. Co.*, 4 S.W.3d 838, 841 (Tex. App.—El Paso 1999, no pet.); *Amarco Petroleum, Inc. v. Tex. Pac. Indem. Co.*, 889 S.W.2d 695, 699 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The Texas Supreme Court has extensively revised the state's discovery-rule jurisprudence since *Taylor* was decided. *See, e.g.*, *S.V.*, 933 S.W.2d at 3-8; *Altai*, 918 S.W.2d at 455-58. But neither *Altai* nor *S.V.* purported to overrule *Taylor*. The intermediate-court opinions stating an unqualified-notice rule upon receipt of an insurance policy do not cite Texas Supreme Court authority overruling *Taylor*. Since a state's supreme court rulings are the primary guide for a federal court making a state-law *Erie* guess, *see, e.g.*, *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016), *Taylor* is still good law.

*Taylor* stands for a narrow proposition that it is not unreasonable as a matter of law to fail

to read an insurance policy upon receipt.  This case does not turn on that question.  Instead, this case turns on whether the 2008 account statements put the plaintiffs on inquiry notice of the fraud considering the total mix of information available to them.  This court does not hold that the plaintiffs were unreasonable as a matter of law in failing to read and understand the disclosure documents on receipt.  Instead, this court has held that ignoring the glaring warning signs provided by the plummeting account values and Mierendorf's shifting, evasive, and internally inconsistent explanations made continued reliance on Mierendorf unreasonable.  That is particularly true in light of the plaintiffs' failure at that point to examine the policy documents to see whether they contained risk information consistent with Mierendorf's reassurances or to take that risk information into account.  *Taylor* is easily distinguishable.  This court has not ruled that plaintiffs were on inquiry notice at the time they purchased the annuities.

The court declines Woodbury's invitation to hold that limitations ran from the time the annuities were purchased.  But because limitations *did* run well before June 2009, the plaintiffs' claims are nonetheless barred.

## III.    Conclusion and Order

The plaintiffs' motion for judgment is denied.  (Docket Entry No. 110).  Woodbury's motion for judgment as a matter of law is granted.  (Docket Entry No. 115).  No later than September 29, 2016, the parties must confer and submit a proposed final judgment consistent with this Memorandum and Order.

SIGNED on September 13, 2016, at Houston, Texas.

Lee H. Rosenthal

Lee H. Rosenthal

24

United States District Judge